**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

|  |  |  |
|---|---|---|
| JOYCELYN BACCHUS, | * | |
| Plaintiff, | * | Case No.: GJH-17-1511 |
| | * | |
| v. | * | |
| | * | |
| THOMAS E. PRICE, | * | |
| Defendant.[1] | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Plaintiff Joycelyn Bacchus brings this action against Defendant Alex Azar, Secretary of the U.S. Department of Health and Human Services ("HHS"), alleging that her supervisors discriminated against her, created a hostile work environment, and retaliated against her in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*., ("Title VII"). ECF No. 1. Now pending before the Court is Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment. ECF No. 15. A Motion Hearing was held on June 6, 2018. For the following reasons, Defendant's Motion, construed as a Motion to Dismiss, is granted, in part, and denied, in part.

## I.     BACKGROUND[2]

Plaintiff Joycelyn Bacchus, who is originally from Guyana, began working at the HHS National Institute of Health ("NIH") in 1986 as a level GS-3 clerk. ECF No. 1 ¶ 6. Over the next thirty years, Plaintiff was promoted up through the ranks of NIH, most recently to a level GS-13

---

[1] The Clerk is instructed to update the docket and list Defendant as Alex Azar, the current Secretary of the U.S. Department of Health and Human Services.
[2] Unless otherwise indicated, the facts are taken from the Complaint and assumed to be true.

Senior Contracting Officer in the Office of Logistics and Acquisitions Operations ("OLAO") in July 2010. *Id.* ¶ 5.

**A. Discriminatory Non-Selection**

In February 2014, Plaintiff applied for a level GS-14 Supervisory Contract Specialist Position ("GS-14 Position"). *Id.* ¶ 12. Brian Goodger, Plaintiff's third-line supervisor and Associate Director of OLAO, was the selecting official for this position. *Id.* ¶ 13. As part of the application process, Plaintiff was initially interviewed by Carol Marcotte and Greg Holliday. *Id.* ¶ 14. In March 2014, Plaintiff was called to an interview with Goodger without advanced notice, which Plaintiff alleges was done to catch her "off guard" so she could not prepare for the interview. *Id.* ¶ 15. Plaintiff alleges that during the interview, Goodger did not discuss the position or Plaintiff's experiences and qualifications; rather, Goodger made "inappropriate and discriminatory remarks" about Plaintiff's country of origin. *Id.* ¶ 16–17. Specifically, Plaintiff alleges that Goodger asked Plaintiff to identify her country of origin and stated that she had a "language barrier." *Id.* ¶¶ 17–18. According to Plaintiff, this was not the first time that Goodger stated that she had a "language barrier"—Goodger had previously made a similar comment during a one-on-one meeting when he had difficulty grasping Plaintiff's explanation of a contracting concept. *Id.* ¶ 19. Plaintiff asserts that she does not have any issues with her communication skills as she is a native English speaker (the national language of Guyana is English). *Id.* ¶ 20. Other than Goodger, Plaintiff alleges that nobody has ever complained about her language, accent, or communication issues.

On April 29, 2014, Plaintiff learned that Goodger had selected Suzanne Cortes-Shrank for the GS-14 Position. *Id.* ¶ 23. Plaintiff alleges that she was more qualified than Cortes-Shrank but was never given a legitimate opportunity to compete for the position because Plaintiff's non-

selection was motivated by her race and national origin. On June 13, 2014, Plaintiff contacted an NIH EEO counselor regarding the purported discriminatory non-selection. *Id.* ¶ 28.

### B. Initial Retaliation – Working Conditions and Transfers

Following this initial contact, Plaintiff alleges that both Goodger and Carolyn Keeseman, Plaintiff's then first-line supervisor, retaliated against her. In late June 2014, Plaintiff met with Goodger to request a transfer to a different branch so that she could provide training to Contract Specialist Keith Savage. *Id.* ¶ 29. Goodger denied the request and, knowing that Plaintiff had just contacted the EEO, stated that Savage would not get the training "because he [separately] went to the EEO" and that Goodger did not like EEO cases or people who went to the EEO. *Id.* ¶ 30.

Thereafter, Plaintiff alleges that Goodger directed Keeseman and other subordinates to take "hostile and aggressive actions" against her in retaliation for her EEO claim. *Id.* ¶ 31. Specifically, Plaintiff alleges that Goodger, along with Holliday, approached Savage and encouraged him to make negative comments about Plaintiff's performance in August 2014. *Id.* ¶ 38. Regarding Keeseman's conduct, Plaintiff alleges that Keeseman improperly questioned and complained about the quality of Plaintiff's work, *id.* ¶ 32; unjustifiably insinuated that she was not aware of what Plaintiff had been working on during the preceding months, *id.* ¶¶ 33–34; created a "false documentation file" containing purported examples of Plaintiff's poor work, *id.* ¶ 36; on June 16, 2014, and contrary to OLAO practice, denied Plaintiff's ad-hoc telework request while she was recuperating from surgery from June 23 to July 8, 2014, requiring Plaintiff to take sick leave for all but three days, *id.* ¶¶ 43, 45; denied Plaintiff's requested "flexi-tour" alternative work schedule that was otherwise allowed pursuant to agency policy, *id.* ¶ 47; on July 11, 2014, terminated Plaintiff's normal telework privileges that had been in place since February 2011, *id.* ¶ 49; and in June 2014, caused the lock to be changed on Plaintiff's office and, over the

ensuing months, frequently entered the office when Plaintiff was out to take files without properly returning them or securing the office, *id.* ¶¶ 52–54.

In November 2014, Plaintiff was transferred to a new supervisor, Danielle Sweeney, who was cold and abrasive towards Plaintiff and told Plaintiff that, according to Keeseman, Plaintiff was a "disgruntled" employee and, according to Goodger, Plaintiff was transferred because she "aired her dirty laundry." *Id.* ¶ 58. Over the ensuing months and years, Plaintiff alleges that she was rotated to new managers and forced to change office locations on extremely short notice for no valid reason. *Id.* ¶ 60. Notably, Plaintiff alleges that she was forced to work in offices that exposed her to mold or was left without working telephones or computers for weeks at a time. *Id.* ¶ 61. Furthermore, in June 2016, Goodger removed several of Plaintiff's assigned contracts and rescinded her ability to sign contracts, which constituted a significant blow to Plaintiff's ability to advance within the agency. *Id.* ¶ 81.

### C. Subsequent Retaliation – Alleged Assault

In August 2016, Goodger assigned Plaintiff to another supervisor, Zedekiah Worsham. *Id.* ¶ 63. On August 24, 2016, Plaintiff and Worsham got into a confrontation. Plaintiff alleges that Worsham came into her office, unjustifiably criticized its appearance, and "was so negative and hostile towards [Plaintiff] that she did not feel safe" and asked Worsham to leave. *Id.* ¶ 69. When Plaintiff went to report Worsham's conduct to Holliday, her second-line supervisor, she found Worsham standing outside Holliday's office. *Id.* ¶ 70. As Plaintiff attempted to enter, Worsham allegedly moved to block the doorway and "came into contact with [Plaintiff], including touching her breast." *Id.* ¶ 71. While Plaintiff maintains that Worsham assaulted her, Plaintiff alleges that Worsham and other employees falsely reported that Plaintiff had in fact

assaulted Worsham. *Id.* at ¶ 74. Two Montgomery County Police officers then appeared at Plaintiff's office but left after finding no basis for Worsham's allegations. *Id.*

Thereafter, Goodger placed Plaintiff on a full-time telework schedule and prohibited her from returning to the office while the agency investigated the altercation. *Id.* ¶ 76. On January 14, 2017, Holliday proposed that Plaintiff receive a 14-day suspension without pay as a result of her involvement in the altercation, yet Plaintiff alleges that Defendant failed to conduct an appropriate investigation in accordance with agency policy and federal regulations. *Id.* ¶ 79.[3] Plaintiff was formally notified of the 14-day suspension on March 28, 2017, which began on April 2, 2017.

### D. EEO Filings[4]

On July 17, 2014, Plaintiff filed a formal EEO complaint against HHS, alleging discriminatory non-selection and retaliation based on Keeseman's conduct through September 2014. ECF No. 15-2 (Report of Investigation, Case No. HHS-OD-075-14). Separately, on September 30, 2016, Plaintiff filed another formal complaint of discrimination and retaliation based on her treatment from November 2014 through August 2016. ECF No. 15-3 (Report of Investigation, Case No. HHS-NIH-OD-150-16). On June 2, 2017, Plaintiff commenced the subject action herein, bringing the following claims under Title VII: Discrimination (Count I); Hostile Work Environment (Count II); and Retaliatory Hostile Work Environment (Count III). ECF No. 1.[5]

---

[3] The Complaint lists this date as January 14, 2016, which the Court presumes was in error.
[4] The Court takes judicial notice of Plaintiff's prior EEO administrative actions as set forth in exhibits attached to Defendant's Motion, to which Plaintiff does not dispute. *See Clarke v. DynCorp Intern, LLC*, 962 F. Supp. 2d 781, 787 (D. Md. 2013) (noting that a court may take judicial notice of the existence and contents of EEOC proceedings but may not take judicial notice of the truth of the matters outside the challenged pleadings) (citations omitted).
[5] Notwithstanding its title, the Court construes Count III to be a claim for retaliation under Title VII.

## II.     STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court may dismiss a complaint for failure to state a claim upon which relief can be granted. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when "the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In evaluating the sufficiency of Plaintiff's claims, the Court "must accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations and internal quotation marks omitted). However, the complaint must contain more than "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet, Ltd v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "Naked assertion, devoid of further factual enhancement" is also insufficient to survive a motion to dismiss. *Id.*

Defendant's motion is styled as a motion to dismiss, or in the alternative, for summary judgment. A court considers only the pleadings when deciding a Rule 12(b)(6) motion. Where the parties present matters outside of the pleadings, and the Court considers those matters, the court will treat the motion as one for summary judgment. *See Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir. 1997); *Mansfield v. Kerry*, No. DKC-15-3693, 2016 WL 7383873, at *2 (D. Md.

Dec. 21, 2016). All parties must be given some indication by the Court that it is treating a motion to dismiss as one for summary judgment, "with the consequent right in the opposing party to file counter affidavits or pursue reasonable discovery." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).

When the moving party styles its motion as a "Motion to Dismiss or, in the Alternative, for Summary Judgment," as in the case here, and attaches additional materials to its Motion, the non-moving party is, of course, aware that materials outside the pleadings are before the Court, and the Court can treat the motion as one for summary judgment. *See Laughlin v. Metropolitan Wash. Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "This standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Thus, "[t]he party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)) (alteration in original).

While the Court may rule on a motion for summary judgment prior to commencement of discovery, *see, e.g., Demery v. Extebank Deferred Compensation Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000), Federal Rule of Civil Procedure 56(d) "mandates that summary judgment be denied when the nonmovant has not had the opportunity to discover information that is essential

to his opposition." *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014) (internal citation and quotation marks omitted). "To obtain Rule 56(d) relief, the non-moving party bears the burden of showing how discovery could possibly create a genuine issue of material fact sufficient to survive summary judgment or otherwise affect the court's analysis." *Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 411 (4th Cir. 2015).

Defendant has provided the Court with a number of affidavits and deposition transcripts from the EEO proceeding in support of its position that the alleged discriminatory and retaliatory actions were taken for legitimate reasons. While the parties engaged in discovery in connection with Plaintiff's first EEO complaint, they have not completed discovery in this action. Plaintiff provides an affidavit pursuant to Rule 56(d) suggesting that in order to fully oppose Defendant's Motion for Summary Judgment, additional discovery is required. ECF No. 18-1. Specifically, Plaintiff states that she has not been afforded an opportunity to depose many of the supervisors central to her discrimination and retaliation claims in order to substantiate her allegations that they acted with a discriminatory or retaliatory animus. Even though these supervisors have provided affidavits stating that they did not act with such animus, Plaintiff will be afforded an opportunity to inquire into the rationale underlying their conduct before the Court will consider their affidavits or any other evidence submitted by Defendant. *See Works v. Colvin*, 519 F. App'x 176, 187 (4th Cir. 2013) (allowing plaintiff to conduct discovery when crucial decision-makers were not deposed as a part of underlying administrative proceeding). Thus, this Motion will be analyzed as a Motion to Dismiss, relying on the allegations in the Complaint, unless noted otherwise.

## III.    DISCUSSION

### A.  Discrimination (Count I)

Plaintiff's discrimination claim is based on her non-selection for the GS-14 Position. Title VII makes it illegal for an employer "to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may establish a Title VII claim through two avenues of proof. *See Foster v. University of Maryland-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015). First, a plaintiff may demonstrate "through direct or circumstantial evidence that [her national origin] was a motivating factor in the employer's adverse employment action." *Id.* (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds, Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). Alternatively, if the plaintiff cannot provide direct or circumstantial evidence, she may proceed under the familiar burden-shifting pretext framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Glenn v. Wells Fargo Bank, N.A.*, 710 F. App'x 574, 577–78 (4th Cir. 2017) (to survive a Motion to Dismiss a Title VII discrimination claim, a plaintiff

"must provide direct evidence of discrimination or make a prima facie case" under *McDonnell Douglas*).[6]

When proving discrimination through direct evidence, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *See Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). A plaintiff must allege more than a situation "consistent with discrimination; [the complaint] must 'alone support a reasonable inference that the decisionmakers were motivated by [impermissible] bias.'" *Nam v. 2012 Inc.*, No. DKC 15-1931, 2016 WL 107198, at *4 (D. Md. Jan. 11, 2016) (citing *McCleary-Evans*, 780 F.3d at 586); *see also Dyer v. Oracle Corp.*, No. PWG-16-521, 2016 WL 70408943, at *2 (D. Md. Dec. 5, 2016) (citations omitted) (under either direct evidence or *McDonnell Douglas*, "the focus is on whether a reasonable juror could conclude that illegal discrimination was a motivating factor in the employment decision."). But it is not enough to allege that an employer had a discriminatory bias—that bias must "bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal citations omitted). "Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action." *Id.*

Defendant argues that Plaintiff has failed to allege that she was rejected from her position under circumstances giving rise to an inference of unlawful discrimination.[7] Defendant also

_____

[6] To establish a prima facie case of discrimination, a plaintiff needs to show that 1) she is a member of a protected class; 2) her employer had an open position for which she applied for; 3) she was qualified for the position; and 4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 959–60 (4th Cir. 1996). If the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its actions. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). The plaintiff must then demonstrate that the legitimate reasons offered by the defendant are but a pretext for discrimination, thus creating an inference that the defendant acted with discriminatory intent. *See id.* at 143. While Title VII plaintiffs more commonly utilize the pretext framework because direct evidence of discrimination is not often readily apparent, *see Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005), plaintiffs are not required to establish a prima facie case of discrimination to survive a motion to dismiss because "the prima facie case . . . is an evidentiary standard, not a pleading requirement." *See Mcleary-Evans v. Maryland Dept. of Transp., State Highway Admin.*, 780 F.3d 582, 584 (4th Cir. 2015) (citing *Swierkiewicz v. Soreman N. A.*, 534 U.S. 506, 510 (2002)).

offers legitimate, non-discriminatory reasons for plaintiff's non-selection. *See* ECF No. 15-1 at 20 n.4 (noting that Goodger testified that Plaintiff has poor written and verbal communication skills).[8] However, because the Court finds that summary judgment is premature at this time, the Court will only consider the facts as alleged in the Complaint and will not undertake an inquiry into whether Plaintiff's failure to promote was legitimate at this stage of the litigation. *See, e.g. In re Rodriquez*, 487 F.3d 1001, 1007 (6th Cir. 2007) ("In direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000))).

Plaintiff alleges that during her March 2014 interview for the GS-14 Position, Goodger made "inappropriate and discriminatory remarks about [Plaintiff's] country of origin," asked Plaintiff to identify her country of origin, and then stated that Plaintiff had a "language barrier," ECF No. 1 ¶¶ 16, 17. Plaintiff contends that this establishes direct evidence of Goodger's discriminatory bias. ECF No. 18 at 16–17. Defendant argues that such conduct falls short of being direct evidence of discrimination because Goodger never explicitly stated that she was not selected for the position because of her national origin or purported "language barrier." *See* ECF No. 21 at 2–3 (citing *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 325 (D. Md. 2003) (finding direct evidence of discrimination when the selecting official stated "I can't come in here in an acting position and start promoting a lot of blacks to super grades")). However, direct evidence of discrimination does not require such a blatant statement or smoking gun; rather, a plaintiff

---

[7] While Defendant initially raised its argument in the context of attacking the fourth prong of plaintiff's prima facie case of discrimination, ECF No. 15-1 at 19, the Court construes Defendant's argument as also attacking whether Goodger's "language barrier" comments made during the interview constitute direct evidence of discrimination.

[8] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

must only show that a discriminatory attitude "[bore] directly on the contested employment decision." *Volochayev v. Sebelius*, 513 F. A'ppx 348, 352 (4th Cir. 2013) (citing *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995), *abrogated on other grounds*, *Desert Palace*, *Inc. v. Costa*, 539 U.S. 90 (2003)).

National origin discrimination may manifest itself through disdain for a plaintiff's accent. *See* 29 C.F.R. § 1606.1 ("The [Equal Employment Opportunity] Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; *or because an individual has the physical, cultural or linguistic characteristics of a national origin group*.") (emphasis added); *see also EEOC v. Orkin Exterminating Co.*, 63 F. Supp. 2d 684, 692 (D. Md. 1999) ("Discrimination based on manner of speaking can be national origin discrimination." (citing *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991))). As a result, courts have determined that statements relating to a plaintiff's accent, when made as part of an explanation for an adverse employment action, may constitute direct evidence of discrimination. *In re Rodriguez*, 487 F.3d at 1006, 1008–10 (finding direct evidence of discrimination from supervisor's statements that plaintiff did not get a promotion due to concerns regarding plaintiff's "language," "how he speaks," and that plaintiff's "accent and speech pattern would adversely impact [plaintiff's] ability to rise through the company ranks"); *id.* at 1009 (noting that a court found direct evidence of discrimination when a supervisor stated that the plaintiff had not been promoted because his fellow employees "are all white and they are not going to take orders from you, especially if you have an accent" (citing *Akouri v. Florida Dep't of Transp.*, 408 F.3d 1338, 1347–48 (11th Cir. 2005))); *Orkin*, 63 F. Supp. 2d at 692–93 (finding that a jury could conclude that national origin was a motivating factor in plaintiff's failure to promote because

evidence portrayed a "corporate attitude of intolerance . . . [that] exposed itself as obsessed [with plaintiff's] accent").

Defendant notes that the Fourth Circuit has held that statements about an employee's accent may be reasonably interpreted as expressing a concern regarding the employee's ability to communicate rather than evidence of discriminatory animus. *See* ECF No. 15-1 at 19 (citing *Jiminez v. Mary Washington College*, 57 F.3d 369, 380 (4th Cir. 1995) ("requiring that a professor speak the native tongue in order to convey his ideas is not any form of discrimination, invidious or otherwise")). But *Jiminez* is not directly applicable here because, at the summary judgment stage, the Fourth Circuit made its determination that there was no evidence of discriminatory animus only after considering "the specific proofs and rebuttals of discriminatory motivation" introduced following discovery. *Id*. at 377. Specifically, the court found that statements related to plaintiff's English proficiency were legitimate after weighing a letter from the employer stating that defendant needed to "[h]ire a professor who speaks English" against testimony from students finding that plaintiff was an "abominable instructor." *Id*. at 380–81. Moreover, the Fourth Circuit has also recognized that when unsubstantiated, concerns regarding a plaintiff's ability to communicate may reflect a discriminatory animus. *See Saleh v. Upadhyay*, 11 F. App'x 241, 259–60 (4th Cir. 2001) (noting that while requiring a professor to possess proficiency in English is not discriminatory, the jury could have reasonably taken comments regarding plaintiff's "poor oral communication skills" and "difficulty understanding [plaintiff's] English" as evidence of discriminatory animus when plaintiff's supervisor had not discussed plaintiff's accent with him in fifteen years (citing *Jiminez*, 57 F.3d at 380)).

At the motion to dismiss stage, the Court must only consider the facts alleged in the Complaint, which suggest that Goodger expressed concern with Plaintiff's accent even though

Plaintiff was a native English speaker and never received complaints about her communication skills from other people. *See Beckford v. Astrue*, No. L-08-2730, 2010 WL 2253654, at \*3 (D. Md. June 1, 2010) (denying motion to dismiss plaintiff's failure to promote claim where plaintiff "provided facts to support her allegations of discriminatory intent by stating that references/remarks were made concerning her Jamaican accent in relation to her non-selection").[9] Because it is alleged that these comments were made during her interview, it is plausible that they bore directly on the contested employment decision. Defendant's Motion to Dismiss Count I will be denied.

### B. Hostile Work Environment (Count II)

Plaintiff alleges that Goodger, Keeseman, Holliday, and Worsham engaged in a pattern of hostile behavior by ostracizing, harassing, and humiliating Plaintiff. To state a claim for hostile work environment, a plaintiff must plead that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993); *see also Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 496 (4th Cir. 2015). The 'severe and pervasive' standard sets a relatively high bar—"complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor, are not actionable under Title VII." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315–316 (4th Cir. 2008).

---

[9] Although the court in *Beckford v. Astrue* framed its analysis in terms of *McDonnell Douglas*, the holding suggests that Plaintiff sufficiently pleaded direct evidence of discrimination. No. L-08-2730, 2010 WL 2253654, at \*4 (D. Md. June 1, 2010) ("Because Beckford has made out a prima facie case under the *McDonnell Douglas* burden shifting framework, *and because her accent appears to be, in part, a factor in determining the promotion*, the case will proceed to discovery.") (emphasis added).

When evaluating an alleged hostile work environment, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer–Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Harris*, 510 U.S. at 23); *see also Lim v. Azar*, No. TDC-17-0438, 2018 WL 1881288, at *6 (D. Md. Apr. 19, 2018) (holding that a supervisor's isolated reference to plaintiff's national origin could not support a claim for hostile work environment because the reference was not "an explicit, odious racial slur or other comparably severe conduct"). Furthermore, even if Plaintiff was subjected to severe and pervasive conduct, it is only actionable if the conduct was motivated by her race or national origin. "The federal anti-discrimination statutes do not protect employees from hostility and abuse from their supervisors unless the objectionable conditions occur because of a protected characteristic." *Robinson v. State Dep't of Corr.*, No. 3:14-CV-391-MGL, 2015 WL 5116880, *5 (D.S.C. July 28, 2015) (citing *Graham v. Prince George's Cnty.*, 191 F. App'x 202, 204 (4th Cir. 2006)).

Here, Plaintiff has failed to allege that she endured a hostile work environment. First, most of Plaintiff's allegations, including her loss of telework privileges, re-assignments, and receipt of unwarranted criticism, fit squarely into the non-actionable category of merely callous behavior by one's supervisors. *See Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (noting that plaintiff's allegations "merely tell a story of a workplace dispute regarding her reassignment . . ."); *Wang v. Metropolitan Life Ins. Co.*, 334 F. Supp. 2d 853, 864 (D. Md. 2004) (noting that "sporadic inconvenience[s]" making it more difficult for plaintiff to perform her job "involve[d] precisely the ordinary tribulations of the workplace" that cannot sustain a hostile work environment claim) (internal citations and quotation marks omitted);

*Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (dismissing hostile work environment claim because "the removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context."). While these allegations may support Plaintiff's retaliation claim, "they were not 'physically threatening or humiliating' acts akin to the verbal and physical harassment that typically characterizes a hostile work environment," and Plaintiff has not alleged that such acts were so debilitating as to unreasonably interfere with her work performance. *See Howerton v. Board of Educ. of Prince Geroge's Cnty.*, No. TDC-14-0242, 2015 WL 4994536, at *16 (D. Md. Aug. 19, 2015) (finding that employer's refusal to interview plaintiff for a promotion, warning plaintiff not to complain, and "papering" his personnel file did not support a hostile work environment claim (citing *Boyer–Liberto*, 786 F.3d at 277)).

Second, Plaintiff cannot show that these actions, even if severe and pervasive, were motivated by Plaintiff's race or national origin. *See Smith v. Allied Systems, Ltd.*, No. CCB-99-224, 2000 WL 708909, at *5 (D. Md. May 8, 2000) ("To establish a hostile [work] environment claim, [plaintiff] must show that 'but for' his race, he would not have been the victim of the alleged discrimination." (citing *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998))). The only connection between these actions and Plaintiff's protected status is Goodger's comments regarding Plaintiff's "language barrier" made in April 2014. Yet nearly all of the actions underlying Plaintiff's claim were perpetrated by managers other than Goodger. While allegations that Plaintiff was either assaulted by Worsham or wrongly accused of assaulting Worsham could potentially rise to the level of severe and pervasive conduct, Plaintiff fails to allege that these actions were in any way related to her national origin. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d

274, 281 (4th Cir. 2000) (denying hostile work environment claim when employer's conduct was "without a hint of racial significance"); *Manguiat v. Board of Educ. of Prince George's Cnty*, No. GJH-13-1165, 2015 WL 2376008, at *5 (D. Md. May 18, 2015) (granting employer's motion for summary judgment on hostile work environment claims because plaintiff's unsatisfactory performance reviews were not related to her race or nationality).

Notwithstanding Goodger's lack of direct involvement with most of these allegedly hostile actions, Plaintiff attempts to impute Goodger's purported discriminatory motive on to Keeseman, Holliday, and Worsham. *See* ECF No. 18 at 23. However, the Complaint fails to set forth factual allegations to plausibly suggest that Goodger orchestrated a grand scheme whereby his subordinates undertook discriminatory actions against Plaintiff on his behalf. *See Twombly*, 550 U.S. at 555 (a plaintiff must provide "more than labels and conclusions" to survive a motion to dismiss).

Third, Goodger's actions, taken alone, were not sufficiently severe and pervasive to support a hostile work environment claim. While a single, isolated statement can establish a hostile work environment, courts have only held as such when the statements were "extremely serious." *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). However callous Goodger's "language barrier" statement may have been, it falls far short of establishing a hostile work environment because that statement was not so extreme or humiliating as to interfere with Plaintiff's work. *Compare Boyer-Liberto*, 786 F.3d at 280 (finding that isolated use of the "porch monkey" epithet was severe enough to engender a hostile work environment) *with Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 191 (4th Cir. 2004) (statement that supervisor stated

17

that "she didn't know how to work with an African-American male" was not sufficiently severe and pervasive).[10] Plaintiff's hostile work environment claim (Count II) will be dismissed.

### C. Retaliation (Count III)

Plaintiff alleges that many of the same actions that created the hostile work environment were also taken in retaliation for Plaintiff filing an EEO complaint. Title VII's anti-retaliation provision serves to "prevent[ ] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006); *see also* 42 U.S.C. § 2000e-3(a). To establish a prima facie claim of retaliation under Title VII, a plaintiff must demonstrate three elements: "(1) [s]he engaged in a protected activity, (2) [her] employer acted adversely against [her], and (3) the protected activity was causally connected to the adverse action." *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 789 (D. Md. 2013) (citations omitted). If a plaintiff cannot produce direct evidence of a retaliatory motive, she may create an inference of such under the framework established for Title VII discrimination cases in *McDonnell Douglas*. *See Waag v. Sotera Defense Solutions, Inc.*, 857 F.3d 179, 191 (4th Cir. 2017). Though the elements of a prima facie claim are similar, Title VII's protections against discrimination and retaliation are not coterminous. *Smith v. Board of Ed. Of Price George's Cnty.*, No. GJH-16-206, 2016 WL 4014563, at *4 (D. Md. July 26, 2016) (citing *Burlington N.*, 548 U.S. at 67). While a plaintiff alleging discrimination must show that she was subject to an adverse employment action that altered the terms or conditions of her employment, a plaintiff alleging retaliation need only show

---

[10] After making the "language barrier" statement, Plaintiff alleges that Goodger denied her transfer request, encouraged other employees to make negative comments about her, and reduced her responsibilities. Even if these actions were undertaken with a discriminatory motive, they occurred sporadically over the course of two years and were therefore not sufficiently pervasive. *See Hopkins v Baltimore Gas and Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (finding that incidents occurring intermittently over a seven-year period, with gaps between incidents as great as one year, were not actionable).

that a reasonable employee would find "the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 68 (citation and internal quotation marks omitted); *see also Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807, 827 (E.D. Va. 2016) ("Under [*Burlington Northern*], effect on terms or conditions of employment can certainly be a factor in the fact-based determination of material adversity, . . . however, effect on terms or conditions of employment is no longer *necessary* to state actionable misconduct in a retaliation claim.") (internal citations and quotation marks omitted) (emphasis in original).

In refusing to limit retaliatory actions to those having an effect on the terms or conditions of employment, the Supreme Court recognized that "[i]nterpreteing the antiretaliation provision [of Title VII] to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends." *Burlington N.*, 548 U.S. at 67. Whether an action is materially adverse "depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (citation and internal quotation omitted); *see also Fordyce v. Prince George's Cty. Md.*, 43 F. Supp. 3d 537, 552 (D. Md. 2014) ("Materiality is an objective determination, meaning that '[a]cts that carry a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects may be considered adverse actions . . .'" (quoting *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010))).

Defendant does not dispute that Plaintiff engaged in a protected activity as early as June 13, 2014, when Plaintiff contacted the NIH EEO counselor regarding her alleged discriminatory non-selection. However, Defendant disputes whether Plaintiff's subsequent treatment was either

materially adverse or casually connected to her protected activity. As discussed below, the Court

finds that Plaintiff has adequately pleaded a Title VII retaliation claim with respect to Keeseman

denying her telework and flexi-tour schedule requests and Goodger transferring her and

removing significant job responsibilities.

### 1. Keeseman's Conduct

Plaintiff alleges that Keeseman took a number of retaliatory actions against her in June

and July of 2014, shortly after Plaintiff filed her initial EEO complaint. Because these actions

occurred as early as three days after she engaged in protected activity, Plaintiff has adequately

alleged that the actions were causally connected. *See Waag*, 857 F.3d at 192 ("close temporal

proximity between activity protected by the statute and an adverse employment action may

suffice to demonstrate causation"). But many of these alleged retaliatory actions fall short of

being materially adverse. Plaintiff's allegations related to Keeseman's criticism, passive-

aggressive behavior, and performance reviews amount to "'petty slights, minor annoyances, and

simple lack of good manners' that will normally not deter employees from complaining to the

EEOC," warranting protection under Title VII. *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d

729, 738 (D. Md. 2009) (quoting *Burlington N.*, 548 U.S. at 68); *see also Mann v. Winston-

Salem State University*, No. 1:14CV1054, 2017 WL 3130324 at *11 (M.D.N.C. Jul. 21 2017),

*appeal docketed*, No. 17-1902 (4th Cir. Aug. 3, 2017) ("[c]ourts within the Fourth Circuit have

generally found that actions which essentially amount to criticism of an employee such as

negative performance evaluations, reprimands or warnings, and counseling are alone insufficient

to constitute materially adverse employment actions under the *Burlington* standard.") (citations omitted).[11]

Although some courts have not found that changes to an employee's schedule or revocation of telework privileges rise to the level of materially adverse employment actions, Plaintiff's allegations regarding Keeseman's denial of her telework and flexi-tour schedule requests, when viewed in context, may have dissuaded a reasonable employee from undertaking similar protected activity as such conduct leads to a tangible impact on the employee's life. *See Burlington N.*, 548 U.S. at 69 ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children."); *see also Robinson v. Ergo Solutions, LLC*, 85 F. Supp. 3d 275, 281–82 (D.D.C. 2015) (denying motion to dismiss retaliation claim for rescinding telework privileges because record was silent as to the potential adverse effect on the plaintiff or her responsibilities outside of work).

Here, Keeseman denied Plaintiff's ad-hoc telework request and, as a result, Plaintiff was forced to use sick leave for all but three days of her two week recovery period. *Id.* at ¶ 45. In addition, because Keeseman denied Plaintiff's requested flexi-tour schedule, Plaintiff was forced to use accrued leave in five and ten minute increments whenever she arrived late to work. *Id.* at ¶ 48. Conversely, the Complaint alleges that other employees were granted the flexibility to telework when necessary and never forced to use accrued leave when running five to ten minutes

---

[11] Additionally, the Complaint omits the exact dates for most of these actions, and it is not clear whether they occurred after Plaintiff filed her EEO complaint on June 13, 2014. *See, e.g.* ECF No. 1 ¶ 32 (alleging that Keeseman criticized Plaintiff "one morning in June 2014"); *id.* ¶ 51 (Keeseman changed the locks in Plaintiff's office in June 2014). While Plaintiff claims that these undated activities "occurred almost immediately after Bacchus complained to Keeseman about Goodger's discriminatory remarks during the phony interview on March 31, 2014," in her opposition to Defendant's Motion, ECF No. 18 at 27, no such support is found within the Complaint itself. *See Zachair Ltd. v. Driggs*, 965 F.Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

late. *Id.* ¶¶ 44, 48. Therefore, the Complaint sets forth a scenario where Keeseman unilaterally forced Plaintiff to adhere to a rigid work schedule while others were routinely granted accommodations, and it is certainly plausible that fellow employees would be hesitant to raise workplace grievances for fear of losing the same benefits and degree of workplace flexibility taken from Plaintiff.

### 2. Goodger's Conduct

Plaintiff alleges that Goodger retaliated against her by denying her request for a transfer from Branch 1 to Branch 4 in late June 2014, ECF No. 1 ¶ 29, transferring her to work under the supervision of Sweeney in November 2014, ECF No. 1 ¶ 58, rotating her through different locations and managers on short notice, *id.* ¶ 60, and removing substantial work responsibilities, *id.* ¶ 81.[12] Transferring an employee, in and of itself, does not rise to the level of being materially adverse. *See Csicsmann v. Sallada*, 211 F. App'x 163, 168 (4th Cir. 2006) (reassignment to a new position where plaintiff's salary, title, bonus eligibility, health care, and retirement benefits remained the same was not an adverse employment action, even where plaintiff's job responsibilities varied); *see also Mackey v. Shalala*, 43 F. Supp. 2d 559, 569 (D. Md. 1999) (noting that courts in other circuits "have generally held that a purely lateral transfer, one that does not involve a demotion in form or substance, or a transfer involving no more than a minor change in working conditions, cannot rise to the level of a materially adverse employment action").[13]

---

[12] The Complaint does not specifically allege that Plaintiff's transfers occurred at the behest of Goodger. However, the Complaint alleges Plaintiff was transferred amongst managers working under Goodger and that after her November 2014 transfer, "Goodger stated that she was being transferred because she 'aired [her] dirty laundry.'" ECF No. 1 ¶ 58. Therefore, for the purposes of Defendant's Motion to Dismiss, the Court will assume that Goodger was responsible for Plaintiff's transfers from 2014 through 2016.

[13] While *Mackey* was decided before *Burlington Northern* expanded the scope of adverse employment actions for retaliation claims, the *Mackey* court's proposition stated herein was made in reference to courts that had "interpreted the scope of 'adverse employment actions' more broadly" and recognized that Title VII did not limit adverse

However, Plaintiff alleges that Goodger did more than merely transfer her between supervisors; he allegedly transferred Plaintiff on short notice, at times requiring Plaintiff to perform her work without functioning equipment or suitable office space. Plaintiff alleges that these continual transfers were intended to encourage her to resign. ECF No. 1 ¶ 62. Additionally, Plaintiff alleges that Goodger removed several of her assigned contracts and rescinded her ability to sign contracts, impacting her ability for career advancement, ECF No. 1 ¶ 81, which courts have often found to be materially adverse. *See Stennis*, 716 F. App'x 164, 168 (4th Cir. 2017) (reassignment of job duties was actionable when it harmed plaintiff's chances to receive tenure); *Mackey*, 43 F. Supp. 2d at 569 (transferring plaintiff to a "career dead-end" position that did not have any promotion potential was an adverse employment action); *see also Phillips v. Dukes*, No. PWG-17-1581, 2018 WL 835709, at *5 (D. Md. Feb. 12, 2018) ("a new work assignment can form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect" (citing *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999))) (internal quotation omitted). Therefore, Plaintiff has adequately pleaded that Goodger subjected her to a materially adverse action and has satisfied the second prong of the prima facie claim of retaliation.

The Court also finds that Goodger's changes to Plaintiff's assigned contracts were causally connected to Plaintiff's protected activity even though Goodger took these actions approximately two years after Plaintiff raised her initial EEO complaint. While temporal proximity may be sufficient to infer causation, *see supra* III.D.1, it is not required. *See Jenkins v. Gaylord Entm't Co.*, 840 F. Supp. 2d 873, 881 (D. Md. 2012) (noting that plaintiffs may state a

---

employment actions to those that only affect monetary considerations. *Mackey v. Shalala*, 43 F. Supp. 2d 559, 568–69 (D. Md. 1999). Therefore, the Court finds that *Mackey* remains persuasive in light of *Burlington Northern*.

prima facie case by "relying on evidence other than, or in addition to, temporal proximity where such evidence is probative of causation"); *Lockley v. Town of Berwyn Heights*, No. JFM-14-825, 2015 WL 5334256, at *10 (D. Md. Sept. 11, 2015) ("If the plaintiff cites additional evidence of causation, however, a longer temporal duration does not necessarily defeat plaintiff's claim.").

Here, Plaintiff alleges direct evidence of a retaliatory animus, stating that Goodger openly discussed his disdain for individuals who filed EEO complaints in order to threaten Plaintiff with retaliation should she proceed with her own EEO complaint and transferred her because "she aired her dirty laundry." ECF No. 1 ¶¶ 29, 30, 58. As Plaintiff has alleged direct evidence, the two-year gap between her protected activity and Goodger's actions is not fatal to her claim at this time. *Cf. Colfield v. Safeway Inc.*, No. WMN-12-3544, 2016 WL 1242592, at *14 (D. Md. Mar. 30, 2016) (noting that analysis of a retaliation claim under *McDonnell Douglas* may not be necessary when there is direct evidence of retaliation).[14] Therefore, Plaintiff's Complaint adequately alleges that Goodger transferred her and rescinded her work responsibilities in retaliation to Plaintiff engaging in protected activity, and Defendant's Motion to Dismiss will be denied as to these actions.

### 3. August 24, 2016 Assault

Finally, Plaintiff alleges the August 24, 2016 assault, and associated personnel actions that followed, were taken in retaliation for her protection activity. At the very least, and as Defendant conceded during the Motions Hearing, Plaintiff's ultimate 14-day suspension rises to the level of a materially adverse action. *See Burlington N.*, 548 U.S. at 72–73 (holding that 37-day suspension without pay, even when employee later received back pay, could constitute

---

[14] In *Colfield*, similar to the facts herein, this Court found direct evidence of a retaliatory animus when a plaintiff's manager openly stated that plaintiff was a troublemaker because he filed an EEOC Complaint and transferred him to an African American manager so that he could be fired without raising an inference of discrimination. *Colfield v. Safeway Inc.*, No. WMN-12-3544, 2016 WL 1242592, at *14 (D. Md. Mar. 30, 2016).

materially adverse action). But this incident occurred approximately two years after Plaintiff raised her initial EEO complaint, and unlike Goodger's alleged conduct, Plaintiff does not allege that the mangers involved here (Holliday and Worsham) had displayed any retaliatory animus towards Plaintiff or were even aware of her protected activity. *See Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006) (finding that plaintiff could not establish retaliatory motive because he did not allege that supervisors knew that plaintiff had been in contact with an EEO Counselor).[15] Therefore, Defendant's Motion will be granted as to the alleged assault and associated personnel actions.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion, construed as a Motion to Dismiss, ECF No. 15, shall be granted, in part, and denied, in part. A separate Order follows.

Dated: <u>July 25, 2018</u>                                    <u>        /s/        </u>
                                                                                       GEORGE J. HAZEL
                                                                                       United States District Judge

---

[15] During the Hearing, Plaintiff argued that the parties had undertaken discovery for the EEO complaint close in time to the alleged assault, creating a causal link between the assault and the protected activity. First, this argument is not supported by any facts alleged in the Complaint. Second, even if considered, the discovery activities Plaintiff is referring to, referenced as a part of Defendant's Motion for Summary Judgment, are limited to declarations and depositions of Keeseman, Cortes, Goodger, and Plaintiff only. *See* ECF Nos. 15-4; 15-5; 15-6; 15-7. In addition, while Plaintiff alleges that Goodger placed Plaintiff on mandatory telework status during Defendant's investigation into the Complaint, ECF No. 1 ¶ 76, Plaintiff does not allege that Goodger was responsible for the initial assault, false allegations, or ultimate suspension.